Mr. Marshall, would you call the last case on the court's docket this morning? Yes, Your Honor, the third case on the docket this morning. 2-1-1-0-3-1-6. People of the State of Illinois. Thank you. A. D. Jeffrey Richardson. Defendant. Defendant. Argue in court in the county. Ms. Annie Baker. Argue in court in the county. Ms. Diane Carroll. Defendant. Thank you. You may proceed. Good morning, Your Honors. Counsel. My name is Anne Fick. I'm from the Office of the State Appellate Defender, and I represent Mr. Jeffrey Richardson. May it please the Court. There are four arguments in this case, but I'd like to focus on the first two, which both relate to the trial court's failure to grant a mistrial. Allowing the jury to hear incriminating DNA evidence, then telling them the next day to disregard it, was so prejudicial that the judge should have granted a mistrial instead of trying to cure the error with an instruction. Some trial errors are just too prejudicial for an admonishment to cure them. As I cited in my opening brief, to suggest the jury disregards such explosive evidence is a recommendation of the jury of a mental gymnastics, which is beyond not only their powers, but anybody else's. So this argument you're making now has, I think, some intuitive appeal, but isn't there also a body of law that says that jurors are presumed to follow the instructions of the trial court? So how do we reconcile those competing interests? The error here is of such a magnitude that there are not instructions that could take away the taint that it brought. And why is that? Because the hat that is the subject of the DNA swab was the only forensic evidence linking Mr. Richardson to this case. And it's clear that the jury was expecting to hear the DNA evidence because they sent a premature note to the court asking about it, and the state mentioned it in their opening. So this was already on their minds. They were told about it from the very beginning, and then the next day, instead of a prompt instruction to disregard, the next day after all 12 witnesses had testified was when the evidence was withdrawn. Can you call our attention to any cases that would suggest that in the context of DNA evidence, there would be a particular rule that it would inherently be so prejudicial it could not be cured by an instruction? Specifically to DNA, Your Honor. Do you have any cases that say that? Well, this Court's decision in People v. Watson touches upon it, although that case does deal with the ineffective assistance of counsel. So it's not precisely on point, but it does have the language in there that explains. The DNA evidence, first of all, is just kind of mysterious and mystical, and it needs to be analyzed and questioned. So in that particular case, although it was about the advocacy and not the admissibility, it speaks to the magnitude of this issue. It's the effect on the jurors. I'm sorry. The effect on the jurors is what you're talking about. Yes, exactly. Let's assume that if we just look at this point in time in the trial, we'll accept the general proposition that the jury is presumed to have followed the judge's instruction in terms of disregard. Is there anything that happened later along the lines that raised the specter that maybe they didn't accept the instruction? As faithfully as they should have? The DNA instruction from the judge on the second date, yes. What would that be? The deliberations in this case, which is my second issue, but it relates to this one as well. It took 10 hours on testimony that the Court said was about 5 hours long. The fact that they deliberated so long and then had notes to the Court that they could not come up with a decision suggests that the DNA evidence was in the very least causing confusion. Well, isn't it getting us off sort of again? You may have some intuitive appeal, but in the realm of speculation, can we ever read jury deliberations, the length of their deliberations, as meaning anything? Yes. I don't think that there can be some suggestion about the jury deliberations, particularly in this case where there was a note at 650 asking what the jury would do if it couldn't come to a verdict. And then an hour later, the note stating specifically that it could not reach a verdict. And because of those, and the ñ excuse me, let me go back. The note saying it couldn't reach the verdict said there was a 10-2 split. The judge did ask about that afterwards. But between 735 and 10, there was two jurors who were talking, and there's an inference that maybe they were being worn down by the rest of the jurors. Again, it's not fact, and we can never know what's in the jurors' minds. That's what I'm saying. It's inherent in the process. We don't know what goes on in a jury room. It could have been nothing to do with any of that. I don't know that there's any case law that even remotely suggests that the length of the deliberation tells you something about what the jury is talking about. How could that ever be? There is a case, and excuse me, I don't recall off the top of my head, but I do know that once the current instruction is given, which it was here, a certain amount of time can pass, and it's indicative of the jury deliberations. And if I may move on to the second argument, then, regarding this. The note at 735. We have all come to an agreement that a unanimous decision cannot be decided. This was after the prim instruction, and based on that clear pronouncement and the course of deliberations up to that point where they tendered many notes to the judge, the judge should have granted defense counsel's request for a mistrial. The Kimball case points out multiple factors to consider when deciding whether to whether a mistrial should have been granted or whether an abuse of discretion occurred. The first of those being the jury's own statements that it's unable to reach a verdict, which it says has repeatedly been considered the most important in determining whether there has been an abuse of discretion. Here the jury could not have been more clear. After the note, the judge asked for the split in the vote, which was 10-2. And, again, after that, defense counsel asked for a mistrial. He asked for a mistrial four times, and it was not granted. And the foreman went in to the jury. The jurors were called back to the courtroom, and the foreman was speaking. And they were trying to ascertain could a decision come tonight. And the foreman wasn't sure. He said he could come up with no solid answer. He said if the time is unlimited, maybe. But apparently, there was, you know, some reason to keep deliberations going. So the abuse of discretion here is based not only on the unreasonableness of the judge's decision here, but also because it's somewhat arbitrary. The jurors knew from the very beginning that there would be two days of trial. The jurors were told that they – let's see. Excuse me. The jurors were told that they were going to be there until Friday, and they were told that at some point, the judge was going to be on vacation on Monday. So with that information that the jurors had, it being a two-day trial, the inference that they deliberated for so long, with declaring that they couldn't come up with a decision, is very reasonable. So if I may. So your argument is the trial court abuses discretion? Yes. As to both the DNA evidence. And no reasonable jurors would agree with the trial court?  The jury here heard about it from the beginning, and they were interested in it as evidenced by the DNA note. And it was clear that they were also, you know, very thoroughly considering it, the case, because they sent other notes to the court, and they said that they were. But at 930, the judge sent the bailiff in and was going to ask them to come back to the courtroom for a third time and ascertain whether a decision could come. And the court and the jurors said that it was a terrible time. That could mean anything, but it could also mean that they were finally getting to the point where these last two jurors were going to change their mind. The jurors asked for another half hour, and at 10 o'clock, they came back with a verdict. So what about the bloodhound evidence? The bloodhound evidence, that should not have been admitted, and I'm arguing that it is ineffective assistance of counsel for it to be admitted. Now, it's clear that the bloodhound evidence is improper, per se. I think case law makes that clear. But isn't it also true in our case of cases that say it does not in and of itself constitute ineffective assistance of counsel? That's my argument in the brief, yes, because... But, I mean, there's case law that's contrary to that. It's per se inadmissible, but not per se ineffective assistance. You've got to look at the totality of the other evidence. Not per se prejudice. In prejudice. In terms of prejudice, the first problem is satisfying, but the second problem is if there's overwhelming evidence of the defendant's guilt. Correct. Right. And here, was the evidence overwhelming or not? No, the evidence was not overwhelming. What about the ID of the defendant by the woman that saw him and said she was 80 percent sure that it was him, and the clerk's identification of the jacket? And it's pretty... And the defendant's ridiculous statements as to why he was in the area. That's pretty compelling. Respectfully, it was the clerk that made the 80 percent identification. Okay. Go ahead. And that identification is suspect because it was made from the back of a squad car at night from a distance. The clerk did not have an opportunity to see this person's face clearly, and this person, Mr. Richardson, has features that are clearly visible on his face, such as facial hair and tattoos. None of that was mentioned. Wasn't he masked? Excuse me? Did he have a mask on? No. The hood of the person robbing the store was, like, closed tight. Well, wouldn't that cover some facial hair? Not in this case. What about the $1,200 or so in the bush beside the porch that he's... That's not usual. People normally don't stash large amounts of cash in bushes, right? That's my understanding. As far as that, the money there was never connected except by inference to Mr. Richardson. It could have been tested for fingerprints because the fingerprint expert said that money is a good surface to be tested for. Well, Conn never testified how much money was stolen, right? I'm so sorry. I'm having trouble hearing. Conn did not testify as to how much money was stolen. Correct. We don't know exactly how much money was stolen from the store,  As far as... I'd like to move on just briefly to the last argument, if I have time. And that is that Mr. Richardson should be given the full amount of credit if this court does not remand. He should be given 155 days of credit for his participation in the Sheriff's very novel program that was all-encompassing in all 24 hours. Do Your Honors have no other questions? I do not, thank you. Okay. Thank you very much. Thank you very much. All right. Mrs. Campbell, you may proceed. Thank you, Your Honors. I will focus on mostly the first and second argument as that seems to be where the questions are coming up. For the second argument, which is whether or not the trial court abused its discretion in not granting a mistrial for the hung jury, the prim instruction was given at 642. The amount of time for deliberation also included that the jury had requested to watch the video of the defendant interview, which is about a half an hour long, but it took a while to get a computer that could play that for them. They also requested the transcript for the canine officer, and it took approximately an hour to get that transcript, so that explains some of the duration of the deliberation. At 830, the jury said that it was continuing to deliberate, and they were asked if they could come up with a verdict this evening, and the jury foreperson indicated that yes, if there was no time limit. Again, that was at 830. At 930, when they hadn't had any word from the jury yet, they were going to recall them to the courtroom again, and the jury sent back a note that it was a bad time and requested 30 additional minutes. I think that is the key here. The trial court was not influencing or interfering or coercing the jury into reaching a verdict. It is the jury themselves who is requesting the additional time. But the communication that you just talked about, that was after the jury had already been primed and said they did not believe they could reach a verdict. Well, when... Am I correct? I have to disagree with that. What was the response there? What happened is that the foreperson is always indicating that the jury is continuing its deliberation, that there are fruitful discussions going on. So they weren't, in fact, deadlocked. They were continuing to have interactions and discussions, and that is what the jury needs to do in order to deliberate and reach the verdict. I pointed out a couple of cases in my brief. There was... In the Kimball case, the court had indicated... Sorry. The judge asked the foreperson if additional time would be helpful, and the foreperson said that it was collective opinion that they were at an impasse and that future continuation of deliberation was futile. The court also noted there were some extremely angry jurors and very loud voices for a period of time. Can I go back to Justice Burkett's question, though? Sure. My notes reflect that the statement by the jury was, quote, we have all come to an agreement that a unanimous decision cannot be decided, close quote, and that was after the prim instruction. Is that not correct? Is that at 615? I don't have the citation, but is that not correct? I think that they made that statement, but then when the judge goes into further questioning of the jury, they always indicate at every stage that they are continuing to deliberate and they are continuing to have discussions. They're going to continue to deliberate until they're told to stop deliberating, but they've given a note to the judge saying we've all decided we're never going to decide. We can't decide. Well, I think at that point, if I'm correct in my recollection, that is when the trial gave the prim instruction. I thought that's after the prim instruction. Oh, I'm sorry. I could be wrong, though, but I'll go back and look, but that was my understanding. So it was after the prim instruction. Isn't that a little problematic? No. I think, you know, when, as I said, when the trial judge is questioning the foreperson, the foreperson is always indicating that the jury is continuing to engage. Well, but he's got a good point because they're going to continue to do that, but the foreperson presumably was one of the people that said we cannot arrive at a verdict, correct? We. . . Somebody's speaking for the jury. Yes, but as I said, you know, in particular, I think the key is the 930 communication where the. . . Let's talk about the 735 communication. This is after the prim instruction. It's at page 13 of Collins brief. We voted a total of four times, three times prior to just recently coming up, and once again after being down here. The vote has never been unanimous. The last two votes have not changed in the tallies. We have all come to an agreement that a unanimous decision cannot be decided. We have all. What? We have all, the operative language. What page is that? Sorry. It's at page 13. Of the defense brief? Page 154. Page 154, the common law record. Sorry. Defense brief at 13, you said? Page 13, right. This is a note from the jury at 735. Okay. Okay. I think. . . Okay, at that point, the judge then asked about the division and found out that it was 10-2. It was very. . . Doesn't Kimball. . . Yes. Why does there have to be more communication with the jury when you get a response like that? Well, I think the judge, in particular with calling the jury down in a face-to-face so that he can consult with them, he would be able to assess, you know, if there's hostility, you know, are the jurors antagonistic? Do they look worn out and just want to go home? So I think, you know, the judge's in-person assessment of the juries is vital in this, and that is why he then asked further questions, and the jurors then indicate that they are continuing to have discussions. I think, you know, I point out that one of the jurors in the voir dire indicated that he had previously been on a hung jury, so obviously, you know, the jurors would know that this is in fact a possibility. And, you know, particularly with the last communication, they could have simply come down and said, you know, no, we cannot come to a verdict. How much clearer can it be than that note? I think that was why the judge called them down, you know, in-person and discussed with them to assess. Does that not begin to suggest a little bit of, I don't want to use the word coercion, but I mean the jury puts a very definitive statement in the note, which Kimball says is the most important factor, and now we have the judge bringing the jury in to say, can't you, are you sure? There are much more coercive statements. I don't like the word coercive. Okay. I don't think the judge was personal. But at a certain point after you prim a jury, there's got to be an end. I mean all these cases where people are appealing are situations where there was a guilty verdict because otherwise we wouldn't know about it. But I mean at some point there's got to be an end. Here they unanimously agreed that they could not unanimously agree. That was the note. That was the note. We cannot agree. And that is why the judge called them down and addressed them in person and asked, you know, are you continuing to have discussions? Because if they're continuing to have fruitful discussions, that is in fact an indication that they are not. Well, why are they setting out this note? If they're continuing to have fruitful discussions, why are they setting the note out? They're seeking more guidance, and that is in fact what they received from the court. The court's guidance then is, you know, if you're continuing to have discussions, you know, if things are coercive. Setting aside that prim might be one of the coercive. No, I won't add a coercive. You don't say coercive. I won't add a coercive. But isn't that the point of prim? Hasn't the judge already told them that in the prim instruction? I think it's interesting that at the point he gave the prim instruction, defense counsel said he wasn't sure that it was yet required. But the judge is, you know, seeking to give them guidance, and that is required not to be coercive but to give guidance. The state indicated basically they wanted to write this thing out as long as possible. So the judge is getting a little prompting from the state. Come on, judge. Hang in there with us. I think that it is a well-known fact that the judges do not always comply with the desires of the state's attorney's office. I'm sure that you would agree with that. Can I turn to a separate issue? Yes. So back to this judge's instruction as it relates to the DNA and the ineffective assistance of counsel in terms of the flood out. Assuming this idea that jurors are presumed to follow the judge's admonitions, the by my count four questions about the cat and the dog, it seems to me the only real relevance to those questions or the reason for those questions is they're focusing on the DNA because that cat with the defendant's DNA is a deal cincher if it had come into evidence. And they're asking about this four times. And I've read your response to that. Oh, they're just curious about the course of the investigation. That seems somewhat implausible, at least to me, because they didn't need that. It seems to me the focus on the dog evidence and the cat, the only reasonable inference is that it relates to the DNA they were told to disregard. I would like to quote the trial judge's curative concern. I'm familiar with it. I'm just beginning to wonder whether they followed it  I would disagree with the obsession. I think that it's established that the trial court is in the best position to assess the effect of the evidence and the effect of any curative instruction. And here the trial judge refused the mistrial because he said, I can cure this, and that's at 560. And then he gives his very explicit instruction to totally disregard it. You can't consider it in any manner, which was followed almost immediately, you know, within two pages. I do not have a problem with the judge's curative instruction. And I think at the time, not grading a mistrial may have been a valid exercise of the court's discretion. I'm just wondering whether the reality, based on the questions coming from the jury after the fact, suggests that they didn't follow the judge's instruction and that relates to the end effect. That makes the failure to object to the dog evidence all that more prejudicial. Okay. I'm going to briefly haze over the fact that the evidence, such as the cell phone and the jacket, would have been otherwise admissible in the court in the course of an investigation. There are cases that talk about he should have, you know, in instances like this, he should file a motion in limiting such a motion to suppress. But I would like to focus on the evidence of guilt. And I have that in my brief at both page 33 and 44. And basically what happened is that there are officers who are out, you know, searching for a suspect. They are near Jane Street. They see a dog walker and, you know, there was no evidence about the dog at the gas station, so they don't pay attention to him. The officer uses his flashlight and the defendant is illuminated by the light of that. When the officers turn around their vehicle to approach him, he flees to the back. May I continue? Yes, you may. He flees to the back porch of a residence of a person that he does not know. He is located, you know, at that residence, sitting right next to the money bush with the $1,200. While the clerk did not testify exactly how much, the residents testified that they do not keep money in that bush and that they had not placed it there. They said they don't know, you know, the defendant, so he had no reasonable explanation. The jury heard the defendant's interview in which he talks about his six- or seven-hour walkabout, and he's there because his sister used to live there, but she doesn't anymore. He can't remember his route. He can't remember where he, you know, peed outside a business. So he doesn't have a plausible reason for being in the neighborhood. In addition... Does the record disclose the exact distance between the 222 James address and the CITCO? And the CITCO. It is .04 miles, and the defendant is discovered there within, I believe, seven minutes of the robbery. And the cell phone jacket and cap are kind of halfway in between. Exactly. The cell phone is discovered in plain view just off the sidewalk on James Street between the CITCO and where the defendant is located. The jacket is in a bush further down James, closer to where the defendant is located. The cell phone is identified by the CITCO gas station clerk as absolutely the one that was stolen in the burglary of the gas station. The jacket he identifies as 100% sure is the jacket worn by the burglar. And he comes to the defendant for a show of identification, and he says he is 80% sure that that is the robber. And he notes the defendant had a hoodie which was drawn up which would have obscured any tattoos. He says he recognizes the defendant 80% because of his lean build and narrow face. And then the jury would also have the opportunity of viewing the defendant's appearance that night because they viewed and, in fact, reviewed the defendant's interview with the police,  What item was used for the dog to scent off of? The dog was not particularly scenting off of anything. The officer said, you know, he would follow, like, the latest trail. So he was not, in fact, tracing. He was just looking for the fresh human trail. Right. And, in fact, followed that to where the officer saw in plain view the phone and then to where the jacket was in the motion. That's why I asked the question because that's exactly what happened in Cruz. A dog trail and the purpose or the theory, the state's theory, was that the dog trail in multiple tracts supported the multiple offender theory. I disagree with that. I think in Cruz that And the blanket that was taken. Excuse me. And the blanket was taken. Yeah. And the items that Janine had touched. Wasn't that the purpose to show multiple offenders? I think in that case there was testimony that the officer wasn't sure that the trail that they followed to the, where the presumed the car had been was actually that of, you know, the person. There had been, you know, multiple people walking around the area. So they were never able to specifically identify that trailing evidence to the perpetrator of the events. And, again, the case law seems to be that dog sniffing evidence can't be used to prove a direct proposition. In this case it would be that the defendant was the person that actually committed the burglary. And that's not what the use was here. It was used as aid because it was dark to find various pieces of evidence. In fact, the officer and Well, that's, I mean, I get what you're saying, but A distinction without a difference. It may be a distinction without a difference. The whole relevance of it was to connect whoever committed the robbery to the ball camp. Right. Well, I think in this case And the phone and the jacket. One of the keys is that when the officer and his canine arrive at the sickle gas station, they get a radio dispatch that other officers on Jane Street have already apprehended the defendant. They're not looking for The problem is not the use of the dog. You can use the dog all you want and get all kinds of incredible evidence. You just can't tell the jury about it. Well, there are various cases that suggest, and I'm spacing on the name of the exact case, but there's a particular case that talks about, you know, the evidence was otherwise admissible and the better course of action would have been to do a motion in limine instead of a motion to suppress. And in that case, the officer could have simply testified.  He got a description. He did a search of the area. He located the defendant close by and then took him back. And that the victim then identified that as the person. Without reference to the judge. Right. And, you know, that may have been certainly Or say inadmissible under Cruz. It is. Well, in Holmes Ms. Campbell, your time is up. Oh, let's see. One other brief comment I had. My opposing counsel mentioned that the jury was like primed because of the opening statement to look for the evidence. And the jury was instructed that opening statements aren't, in fact, evidence. And the other DNA evidence was presented in other technical. The cell phone they attempted to fingerprint and there was nothing usable. They fingerprinted at the gas station and there was nothing usable. So the whole mystique of DNA evidence was pretty much debunked in this case because of the evidence was, in fact, excluded. And the thorough cross-examination of Officer Blomberg, who was the evidence. Unfortunate evidence. There's a lot of zeros in the number octillion. But the jury was instructed very specifically. And one of the cases I cite mentions this is the Taylor case where the jury got the slip opinion that wasn't admissible evidence. The reason I included that is because defense theory is that this admissible evidence was, in fact, considered by the jury. And the court there found very specifically that the judge's very careful consideration, you know, instructed to the jury not to consider this whatsoever cured the presence of the admissible evidence. In this case, there was not a series of questions from the jury suggesting that perhaps they weren't following the instruction. I don't think that the jury's requests necessarily indicate that they were considering the DNA. They were obviously very thorough, careful jury. They are looking at the cell phone and the jacket. And that is appropriate. They are looking at I'm trying to think of what else they asked for. They're looking at the defendant's confession and his statements. So I think, in fact, they are just a very careful, very thorough jury who were not unduly influenced to reach their verdict, because, in fact, they were the last party to ask for more time. Thank you, Ms. Campbell. Thank you. Ms. Fick, you may proceed. Thank you, Justice. I do have a question to start off before we overlook it. Just to protect this reading from the brief, did the defendant ostensibly flee when the police put a flashlight on him? He walked from the scene? He admits. I'm sorry, what's that? Did he take off the flashlight? He admits that he ran. He ran because he had a warrant out. Tragic. Right. That's what he said. The flight would be considered as evidence of guilt, correct? It is, but it wasn't argued as such. And it wasn't set forth as being the reason that he was considered a suspect. The issues, the most pressing issues in this case is whether Mr. Richardson got a fair trial. And he did not, because the judge, unfortunately, abused his discretion by allowing the DNA evidence and then by refusing to acknowledge the jury's notes. If I may just briefly go through the deliberation timeline just to have it clear. The deliberation started at 1242. At 153, there was a jury note about the dog sniff. At 438, there was a jury note about the canine officer. At 5 o'clock, they communicated. At 642, that was when the jury said in the jury process, what's the next step if there is not complete agreement on the verdict? After that, the instruction was read. The judge then asked about the vote division. The vote division was given, and the judge told the jury to keep deliberating. The judge continued asking, excuse me, the judge continued to tell the jury to deliberate. The judge told the jury to deliberate five times between 1242 and 10 o'clock. And it's important to note that there is evidence that the jurors may have been tired. There was a phone call between 430 and 5 from two jurors who had to call home because they said they didn't expect court to go that late. While it's not proof, it certainly supports the inference that these jurors were worn down. Regarding the Taylor case, the slip opinion that was inadvertently given to the jury was not admitted as evidence. It wasn't presented as truth and then asked to be taken away during the trial, during the fact-finding period. It was not inculpatory. And the judge admonished the jury within three to four hours of them getting the opinion, which is not the case here. The judge, there was an entire day the jurors went home, they came back, they heard Officer Blomberg's testimony, and then they were told to ignore it. Additionally, as far as the mistrials for the deliberations, Kimball sets forth other factors that support the argument that this should have been a mistrial. In addition to the jury's statements, the length of the deliberations, the length of the trial, complexity of the issues, jury's communication to the judge, among them. The length of deliberations, obviously, 1242 to 10 p.m. The length of the trial, that's something the judge repeatedly recognized, that they'd been deliberating this long when the testimony only took five hours. The complexity of the issues, the issues here were straightforward. Was Mr. Richardson the person in the video, and was he carrying a firearm? Again, the jury's communications to the judge, I just mentioned how many times they had talked to the judge and expressed that they were curious about evidence and then that they were not coming to a verdict. So based on all of the above and all of this, the trial court abused its discretion by failing to grant a mistrial after the DNA evidence was excluded and then, again, after failing to grant a mistrial due to the deliberations. Thank you. No, thank you. All right, thank you. Thank you. All right, that will conclude the arguments in this case. The matter will, of course, be taken under advisement and a written decision we should do first. I want to thank both counsels for their arguments and what is, of course, an interesting case. Please be well, and we are adjourned for the day. Thank you.